THE STATE, Appellant, v. OLLIE B. GOMER and THE FIDELITY & CASUALTY COMPANY OF NEW YORK, a Corporation.—101 S. W. (2d) 57.

Division One, December 14, 1936.

*Roy McKittrick*, Attorney General, and *Drake Watson*, Assistant Attorney General, for appellant.

*W. H. Meredith* and *David W. Hill* for respondents.

HYDE, C.—This is an action, brought by the Attorney General in the name of the State, upon bond of the assessor of Butler County, in the penal sum of $1000, conditioned upon the faithful performance of ''the duties of his said office according to law, during the legal term of said office.'' The purpose of the suit was to recover for the State treasury $633.85, alleged to have been paid to him therefrom and received by him for assessment lists in 1932, which were not actually made. The trial court found for defendants and this appeal is from the judgment entered in defendants' favor.

The bond was put in evidence, and the case was submitted below upon an agreed statement of facts, which were in substance the facts stated in the petition. The admitted facts were, as follows:

''That the defendant, Ollie B. Gomer, charged for 10,388 assessment lists for the year 1932, and was paid by the State of Missouri, 17½ cents for each of said lists; that each and every one of said real estate and personal lists were entered in the Permanent Assessor's Tax Books for that year, but that of said lists for 3,455 the defend-

ant Gomer did not take sworn statements from the property owners under Section 9759, R. S. 1929, and made no statements himself under Section 9760, R. S. 1929, and *made no list* thereof similar to the assessor's list called for by said Section 9760, a copy of said list in blank being hereto attached and marked exhibit 'A-2,' *except on the assessment books* for the reason that the said number 3,455 was made up of nonresident property owners, whose whereabouts were unknown to Gomer, and other such persons who could not be located by the said Gomer, some of them being minors and insane persons and property lists furnished by the Probate Court, the Recorder of Deeds and the Secretary of State, and the County Court, and that the said Gomer *made no statement* of said 3,455 lists *except those stated in the Tax Books*, which contained the full number 10,388.'' (Our italics.)

We take it from the briefs that most of the nonresident property owners referred to owned only real estate in Butler County. Since this suit is founded upon breach of the condition of his statutory bond (Sec. 9754, R. S. 1929) to ''faithfully perform the duties of his said office according to law,'' this controversy necessarily involves a construction of the revenue laws, because we must determine the duties of the assessor, and decide whether the facts show a failure to faithfully perform them. The alleged breach of the bond can only be on the theory of a failure to properly make assessments of nonresident owners of real estate, and of personal property owned by persons who could not be located, including minors, insane persons and estates of decedents, and, for that reason, recovery of the compensation received therefor by the assessor, was sought. Respondents' position is that although no lists were ''made up of nonresidents and other persons whose whereabouts were unknown,'' nevertheless the property owned by such persons was ''entered in the assessor's books and the property duly assessed;'' and that ''the law does not require a foolish thing to be done, that is, to make out a list on a piece of paper when there is no owner to verify it by his oath.'' Respondents further point out that the word list is used in the assessment statutes to designate other lists or documents than the one which taxpayers are required to deliver to the assessor, and say that the assessor's compensation is to be computed on the basis of a list made opposite the name of each owner on the tax book rather than the list taken from each owner on the form described in Section 9756. From 1845 to 1909, the entry in the assessment book, of the taxpayer's name and property owned by him, was the basis of county assessor's compensation, but a review of our assessment statutes and amendments thereto show that a different system is now in effect. [Sec. 45, Art. II, Chap. 147, R. S. 1845; Sec. 9196, R. S. 1899; Laws 1909, p. 717.] It is very difficult, if not impossible, to determine either the exact duties or the true basis of compensation of assessors from present statutes without studying the history of their origin and amendment.

Our present Constitution, as did our original Constitution, provides that "all property subject to taxation shall be taxed in proportion to its value." [Art. X, Sec. 4, Const. of 1875; Art. 13, Sec. 19, Const. of 1820.] This provision does not provide a method of assessment and makes no distinction between real and personal property. Assessment of property is the method, provided by the Legislature to carry out this constitutional provision and our present assessment statutes clearly prescribe different methods for the assessor to use in locating taxable land from that provided for finding taxable personal property, and each is required to be listed in a separate part of his book for assessment. Our present system of assessment is substantially the one adopted in 1872. [Laws 1872, pp. 88-97.] Prior to that time, a system of requiring all property owners to deliver lists, at designated and advertised times and places, had been tried. [G. S. 1865, Title V, Chap. 12.] The system of the assessor taking lists by calling upon property owners, adopted in 1872, was substantially the same as the earlier method used, except as to real estate. [R. S. 1855, Art. II, Chap. 135.]

Under every system used, we find the same provision in the same language as present Section 9760, Revised Statutes 1929, which is here cited as requiring assessors to make a list of real estate owned by nonresidents who have no personal property in the county. It is, as follows:

"Whenever there shall be any taxable property in any county, and from any cause no list thereof shall be given to the assessor in proper time and manner, the assessor shall himself make out the list, on his own view, or on the best information he can obtain; and for that purpose he shall have lawful right to enter into any lands and make any examination and search which may be necessary, and may examine any person upon oath touching the same." [Sec. 32, Revenue Act of 1872, p. 90, Laws 1872; Sec. 26, Chap. 12, Title V, G. S. 1865; Sec. 29, Art. II, Chap. 135, R. S. 1855.]

However, prior to the Revenue Act of 1872, the list which property owners were directed to deliver to the assessor was required to be "a just and true list of all property taxable by law, except merchandise;" and the oath of the taxpayer was that he had given "a true and correct list of all taxable property . . . owned." [Secs. 11, 12 and 13, Chap. 12, Title V, G. S. 1865; Secs. 18, 19, 20 and 26, Chap. 135, R. S. 1855.] It was then specifically provided that the list, which the owner of property was required to deliver to the assessor, should "particularly describe each tract of land contained therein;" and also "each town lot." [Secs. 13, 14, Chap. 12, Title V, G. S. 1865; Secs. 21, 22, Chap. 135, R. S. 1855.] It was also then provided that every assessor should "make out, from the lists delivered to him . . . distinct lists for each county in which any such taxable property may be, and transmit the same, by mail or

otherwise, to the assessor of the proper county." [Sec. 20, Chap. 12, Title V, G. S. 1865; Sec. 23, Chap. 135, R. S. 1855; see, also, Sec. 15, Art. II, Chap. 147, R. S. 1845.] This list, undoubtedly, was mainly for the purpose of putting taxable real estate on the books because personal property was then as now taxable in the county of the owner's residence. [Sec. 6, Chap. 11, Title V, G. S. 1865; Stephens v. Boonville, 34 Mo. 323.] It was further provided, prior to 1872, that the assessor should make "a complete list of all the taxable property in his county," in a book which should "contain the names, in alphabetical order, of all persons to whom property has been assessed," with "separate columns for the names of the owners, each kind of property taxed, the assessed value of each kind and the whole amount chargeable to each person," for both real and personal property; and that in this alphabetical list "each tract of land and town lot shall be assessed, valued and listed separately," in a separate column opposite the owner's name, but with all other property. [Secs. 40-43, Chap. 12, Title V, G. S. 1865; Secs. 43-46, Chap. 135, R. S. 1855.] The assessor's compensation in 1855 (which was paid half by the county and half by the State) was twenty cents per name for the first 600 names listed, fifteen cents for the second 600, ten cents for the third 600, and five cents for each additional name, "all the property assessed to one individual to be counted as one name." [Sec. 58, Chap. 135, R. S. 1855.] Since all property, real or personal, was then listed at the same place in the book opposite the owner's name, it is clear that, prior to 1872, the assessor was required to get a list, or make one himself, covering every item of taxable property in his county, whether real or personal; but that his compensation depended not upon the number of lists taken but upon the number of property owners listed in his book.

It is also clear that the 1872 act provided an entirely different method of assessing real estate; that under this method the list taken from property owners was not required to contain a description of real estate; and that no list was required to be taken from or delivered by any resident of a county who owned no personal property, nor from any nonresident who owned nothing in the county except real estate. The 1872 act provided that the assessor annually should "proceed to take a list of the taxable *personal* property in his county," to which list each property owner was required to make oath that it contained "a true and correct list of all *personal* property made taxable by the laws of the State." [Secs. 28, 31, Act of 1872, pp. 89, 90, Laws 1872.] These same sections with changes and additions hereinafter noted are Sections 9756-9759, Revised Statutes 1929. As to real estate, the 1872 act provided that instead of getting the description thereof from owners, or from assessors in other counties, the clerk of the county court should deliver to the assessor "the assessor's book of the last assessment of real estate and the list of tax-

able lands furnished by the register of lands," at Jefferson City, now included in the duties of the Secretary of State (Sec. 11374, R. S. 1929); that the assessor should, by examination of these records and the maps and plats which the county court was directed to procure from the United States land office, make a correct book brought up to date by having "entered annually" thereon "such additional lists of lands subject to taxation . . . furnished . . . by the register of lands;" that lands were to be assessed only "every two years," which assessment should "be the basis of taxation . . . for the two years next succeeding;" and that "the assessor, on examination and comparison of *the list of property delivered by individuals,* and *the list of lands furnished by the secretary of state, and said maps and plats,* and after diligent efforts for ascertaining all taxable property in his county, shall make a complete list of all the taxable property in his county, to be called the assessor's book." [See Secs. 38-48, Act of 1872, Laws 1872, pp. 91-92; Secs. 9769-9779, R. S. 1929.] This is the present method of assessing real estate. Practically the only change in these original sections, except the substitution of "Secretary of State" for "register of lands," is that land is now required to be assessed annually, although through oversight the county clerk is still only required to deliver the last assessment book and lists of lands to the assessor "every two years." [Sec. 9769, R. S. 1929.]

Section 49 of the Act of 1872 (Laws 1872, p. 92), as does present Section 9780, Revised Statutes 1929, required the assessor's book (instead of being one alphabetical list of property owners) to be "divided into two parts; . . . *part first* to be . . . *'the land list'* " containing "in numerical order of range, township, section" or "according to the number of block, lot, or parcel" all lands assessed "with the owner's name, if known," or original purchaser if not; and *"part second,* . . . the *'personal property'* " with "names of all persons liable to assessment, alphabetically arranged," with "the personal property respectively owned by them . . . in tabular form, with suitable captions and separate columns . . . for each kind of property (and), the assessed value thereof."

█ It was and still is further provided that "if the assessor discovers *any real property,* presumed to be subject to taxation, *which has not been returned to him by the clerk,* he shall assess such property and enter the same on the assessment list;" and that "if by any means *any* . . . *land* . . . shall be omitted in the assessment of any year . . . the same, when discovered, shall be . . . placed upon his book." [Secs. 51-52, Act 1872, Laws 1872, p. 93; Secs. 9788-9789, R. S. 1929.] The assessor is required to "value and assess all the property" on his books "according to its true value in money" and to return a copy thereof to the county court within the time fixed. [Secs. 54 and 62, Act of 1872, Laws 1872, pp. 94-95;

Secs. 9792 and 9800, R. S. 1929.] As to both real and personal property, "the return of this book to the county clerk's office completes the assessment." [Wymore v. Markway, 338 Mo. 46, 89 S. W. (2d) 9.]

Under the 1872 act, the assessor was clearly put on a different basis of pay for assessing land than for assessing personal property. His compensation was "for making the numerical assessment (in the land list) . . . such amount as may be allowed by the county court . . . not to exceed the sum of three cents for each and every tract or town lot assessed" (nothing was said about the State paying any part of this); (Sec. 49, Act 1872); and "twenty-five cents each name for the first 1,000 names listed;" twenty cents for the second 1,000 names, and fifteen cents for each additional name over 2,000 on the personal property list, "*all personal property assessed* to one individual to be counted as one name," (half to be paid by the county and half by the State) but with the proviso that nothing "in this section shall be so construed as to allow any pay per name for the name set opposite each tract of land assessed in the numerical list." This would seem to justify an original construction that the State was not to pay any part of the compensation for making the assessment of land.

The idea of a separate land list and a numerical assessment of tracts of land no doubt came from the provision in the 1865 statutes requiring assessors to make a book called "the land register" and enter therein "each tract of land in his county" showing ownership, description, valuation, delinquency, and whether forfeited to the State or sold for taxes. [Secs. 15-18, Chap. 12, Title V, G. S. 1865.] This land was also required to be listed in the assessor's book opposite the names of each owner (in alphabetical order) together with the personal property owned by each, and the assessor was to be paid for the land register "such compensation as may be allowed by the county court not to exceed two cents per tract." There was no provision for the State to pay any part of this, such as there then was for listing names and property in the assessor's book. [Sec. 54, Chap. 12, G. S. 1865.] Apparently some of the larger counties, after 1872, desired to continue the alphabetical arrangement of all names of property owners. This was permitted by amendments in 1881 and 1883. [See Laws 1881, pp. 178, 182, Laws 1883, pp. 137, 140.] This alternative optional system has been continued without change and is now set out in Sections 9781-9787, Revised Statutes 1929, providing for separate land and personal property books and a land list kept up to date by the recorder of deeds. Compensation for "suitable and efficient means" to secure "a full and accurate assessment of all property" under the authority of these sections may be provided "out of the county treasury."

No substantial change has since been made in the methods adopted

in 1872 for assessing real and personal property. The contents of the list, which property owners are required to deliver to the assessor and the oath to be made thereto, have been specified in more detail. An amendment in 1877 (Laws 1877, p. 377) required that it contain "a list of all the real estate and its value." Nevertheless, this section still only requires (as does Sec. 9756, R. S. 1929, now) the assessor "to take a list of the *taxable personal property* in his county." The specific property set out in the oath in Section 9759, Revised Statutes 1929, is all personal property. A new section has been added to provide a method for obtaining lists of personal property of estates. [Sec. 9763, R. S. 1929; enacted Laws 1893, p. 218; amended Law 1903, p. 255.] Even the sections in regard to assessment of corporations only provide for returning lists of personal property to the assessor, and the value of real estate owned by banks is deducted from other values in determining the assessment of their shares of stock. [Secs. 9764-9765, R. S. 1929.] No change has been made in the sections prescribing the method of assessing real estate, and all these provisions construed together clearly show that no change was made or intended to be made in the method of assessing real estate. ■

No doubt the purpose for requiring real estate to be listed in the personal property list, delivered to the assessor, was to give him information in order to assist him in keeping his books correct and up to date as to descriptions and owners of land, and to show the owner's idea of its value. However, the correct name of the owner of real estate is only a matter of convenience, and is not necessary to the validity of the assessment, which is made against the land itself rather than its owner and under which taxes levied are a lien on the land (Secs. 9747, 9793, R. S. 1929) ; and the assessor is required to exercise his own judgment as to value. [Wymore v. Markway, supra.] It is, therefore, clear that the assessment of real estate does not in any way depend upon a list made under the provisions of Sections 9756 or 9760 (State ex rel. Hudson v. Carr, 178 Mo. 229, 77 S. W. 543) ; and that it was not intended, by carrying present Section 9760 over from the old plan of assessment into the 1872 act, to require that there be a list of tracts of land by the assessor for nonresident owners of real estate or for any persons he cannot locate unless they have "taxable personal property in his county." It is the assessor's duty to get a list, or make one himself, to cover all taxable personal property, but he is required to put all real estate on his book from his own investigation of former tax books, maps, plats, records, and other necessary information. Real estate cannot be concealed, but can all be found on a map. In fact, it can be more completely and accurately accounted for by use of a map than by inquiring only among property owners. An assessor can put all taxable real estate on his books, whether he can find out who owns it or not. That is all that is essential to a valid assessment of it; although it is his duty to get in-

formation as to description, ownership and value of land, when he takes lists of personal property, and to keep his book corrected to show the correct description and true ownership of land, from such information.

 This brings us to the matter of how the assessor's compensation is now determined. The 1872 method of computing the amount to be paid was not changed until 1909. Compensation was then put on the basis of lists taken, instead of names listed in part two of the assessor's book. It was fixed at "twenty-five cents per list *for taking the first three thousand lists* and twenty cents for each list in addition thereto," and there was also allowed "three cents per entry *for making personal assessment book.*" The State and the county were still each required to pay half of this compensation. However, the amended section stated *"all the real estate* and personal property assessed to one person to be counted as one name," while the old one had said "all personal property assessed to one person to be counted as one name." The amended section continued the original proviso that "nothing contained in this section shall be construed as ·to allow any pay *per name* for the name set opposite each tract of land assessed in the numerical list." [Laws 1909, p. 717, Sec 11398, R. S. 1929.]

It is difficult to understand just what was intended by this change, since the new section stated that the fee of three cents per entry was for *"making personal assessment book,"* and Section 11372, Revised Statutes 1909, continued without change the provision that "the assessor shall be allowed, as a compensation for making the numerical assessment . . . such amount as may be allowed by the county court . . . not to exceed the sum of three cents for each and every tract so assessed." It seems impossible to harmonize the provision "all the real estate . . . assessed to one person to be counted as one name" with the provision in the same section that it was not to "be construed to allow any pay per name" for assessing land. One would seem to cancel the other leaving the method of computing compensation for assessing real estate the same as it was before. It is clear that for personal property assessed, before 1909, a list was required to be taken from each owner of personal property, but the assessor was paid only for listing his name and personal property in his book; and, after 1909, the name and personal property of each owner was required to be listed in the assessor's book, but the assessor was paid one amount for taking the list, and an additional three cents per owner of personal property for listing his name and the personal property assessed to him in the personal property part of the book. This made the pay in proportion to the work, because it would ordinarily take more time and effort to find a property owner and take the list of his property than it would to make an entry in the book of his name and the amount of personal prop-

erty assessed to him. But what is not clear is the part of the 1909 amendment which made the section read ''all *the real estate* and personal property assessed to one person to be counted as one name.''

Some light may be thrown upon this question by a consideration of the provisions relating to assessors in counties under township organization. There was no provision for township organization until the adoption of the Constitution of 1875. [See Secs. 8, 9 and 14, Art. IX, Const.] In 1879 an enabling act was passed to make these provisions effective. [Laws 1879, pp. 218-235.] This provided for separate lists of personal property owners, in alphabetical order, and a land book. [Sec. 7527, R. S. 1879; Sec. 12329, R. S. 1929.]

The assessor's compensation was fixed as follows:

''He shall receive, as compensation for his services fifteen cents for each list taken by him; and for each tract of land or town lot assessed by him, and properly entered in the township land book, he shall receive ten cents, one-half to be paid by the county and one-half by the state, as now provided by law; provided, that all the personal property listed, belonging to any one individual, or company or firm, shall only constitute one list as to compensation.'' [Sec. 7529, R. S. 1879.]

This was amended in 1883 (Laws 1883, p. 198) to add the provision that ''all the lands owned by the same person in any one section, shall constitute but one tract, and all the land owned by the same person in any one block, shall constitute but one lot.'' There is a similar provision, applying to county assessors, in Section 9780, Revised Statutes 1929 (it has been a part of this section since 1877, Laws 1877, p. 379), which states that ''the assessor shall consolidate all lands owned by one person in a section, and all town lots owned by one person in a square or block, into one tract, lot or call, when it is practicable.'' [See, also, Sec. 9792, R. S. 1929.] There was an amendment in 1921 (Laws 1921, p. 272) to increase the compensation of township assessors for each list taken from fifteen cents to twenty-five cents; and it was amended again in 1931 (Laws 1931, p. 376) to increase this to thirty-five cents. Thus township assessors have always been paid on a different basis for assessment of personal property than for assessment of land; namely, as to personal property per list taken from each person, but as to land per tract entered and assessed on his book; and the State has always paid half of each.

The early provisions for paying county assessors failed to specifically require the State to pay any part of the amount allowed to them by the county court for assessment of land. The Amendment of 1909 put their pay for assessing personal property on the same basis as township assessors were always paid; namely, a certain amount for each list taken. Although it gave them additional compensation for making the entry on the personal assessment book from the list taken, it certainly did not change their compensation for assessing real estate. Neither did the later amendments. It seems reasonable that

it was intended for the State to pay half of the compensation allowed them for assessing real estate, as was done for township assessors. This has always been clearly stated in the statute fixing the compensation of township assessors, but it was certainly left in doubt by the 1909 amendment as to county assessors and it is not yet clearly stated even by amendments subsequent thereto.

A change in this section in 1919 affected only "St. Louis City, and . . . counties . . . which now pay their assessor a stipulated salary." [Laws 1919, p. 717, Sec. 12816, R. S. 1919.] Another change was made in 1921, which increased the compensation to "thirty cents per list *for taking* the first *3,000 lists* and twenty-five cents for each list in addition thereto" (in counties not over 45,000), but left the fee of "three cents per entry for *making personal assessment books*" as it was, including the provisos which we have set out above. [Laws 1921, p. 671.] Other changes, made in 1929 (Laws 1929, p. 415), and in 1931 (Laws 1931, p. 358) have made the now material parts of this section (9806, R. S. 1929) read, as follows:

"The compensation of each assessor shall be thirty-five cents per list in counties having a population not exceeding forty thousand, . . . and shall be allowed a fee of three cents per entry for making *real estate* and personal assessment books, all *the real estate* and personal property assessed to one person to be counted as one name . . .: Provided, that nothing contained in this section shall be so construed as to allow any pay per name for the name set opposite each tract of land assessed in the numerical list." (The State and the county are each to pay half of this compensation.)

The provision "the assessor shall be allowed, as a compensation for making the numerical assessment, . . . such amount as may be allowed by the county court . . . not to exceed the sum of three cents for each and every tract" assessed on the land list was not changed, but was carried into the Revision of 1919 as a part of Section 12790, and in the Revision of 1929, as a part of Section 9780. The language of Section 9806, Revised Statutes 1929, is that the assessor's compensation "shall be thirty-five cents per list" instead of so much "per list *for taking* . . . *each list*" as heretofore, but we think that both provisions were intended to mean the same thing, and we so hold. Section 9806, Revised Statutes 1929, now says that the assessor "shall be allowed a fee of three cents per entry for making *real estate* and personal assessment books," instead of as heretofore stated "three cents per entry for *making* . . . *personal assessment book*," and we believe the words "*real estate* . . . *books*" must have been added to make it clear that the State was to pay one-half of the county court's allowance up to "three cents for each and every tract" properly assessed on the land list as, well as "three cents per entry" for each name of a property owner entered upon the personal property list in the assessor's book. We under-

stand this to be the executive construction which has been given to this section by State Auditors in their administration of it. **This** seems to be a reasonable construction and we think it should be upheld. There is no good reason why the State should pay half of the assessor's compensation for assessing real estate in counties under township organization and not pay any part of it in other counties. As the section now reads, it seems proper to construe the provision, authorizing the county court to allow not to exceed three cents for each tract assessed on the land list, with the section providing for the State to share in paying compensation for making real estate books, and we so hold.

Our conclusions, therefore, are as follows:

First: That an assessor should, obtain a list in the form prescribed by Section 9756, Revised Statutes 1929, from every person who owns "taxable personal property in his county," and should require such list to contain "a list of all the real estate and its value" owned by such persons.

Second: That whenever from any cause a list of any taxable personal property is not delivered to him by the owner or his representative, then the assessor shall make a list thereof as required by Section 9760, Revised Statutes 1929, or if the owner of such property is deceased then as required by Section 9763, Revised Statutes 1929.

Third: That an assessor is not required to take the list described in Section 9756, Revised Statutes 1929, from persons who own no "taxable personal property in his county," and is, therefore, not required to make the list required by Section 9760, Revised Statutes 1929, for only real estate owned by nonresidents of his county.

Fourth: That an assessor is required to make "Part First" of his book, denominated "The Land List" from the list of taxable lands in his county furnished by the Secretary of State, the government maps and plats on file in his county, the last assessor's book and other information or records (see Sec. 9797, R. S. 1929); and that he shall use the information obtained from the lists taken from personal property owners and from other sources to aid him in obtaining a correct description of all tracts of land, in placing the name of the true owner opposite each tract, and in ascertaining its value.

Fifth: That an assessor is required to make "Part Second" of his book, denominated "Personal Property," from the lists taken by him from property owners, or made out by him whenever, for any cause, it has not been possible to obtain from the owner a list of any taxable personal property which he has been able to locate.

Sixth: That as compensation for making the numerical assessment in the land list, an assessor should be paid such amount as may be allowed by the county court not to exceed the sum of three cents for each and every tract so assessed; but that all contiguous tracts in the same section and all contiguous lots in the same square or block

which can be consolidated into one tract, lot, or call shall be counted as one tract.

Seventh: That as for compensation for taking the lists required to be delivered to him by owners of personal property (in counties of not more than 30,000 population) an assessor should be paid thirty-five cents for each list taken and should also be paid a fee of three cents per entry for each entry, of a property owner's name and the personal property assessed to him, in the alphabetical list in the part of his book covering personal property.

Eighth: That an assessor is entitled to thirty-five cents per list for each list he takes which contains personal property, whether he takes it from the owner or makes it on his own view or other information obtained as specified under Section 9760 or Section 9763, Revised Statutes 1929, but he is not required to make or entitled to receive any compensation for making a list containing only real estate.

Ninth: That the county and the State shall each pay one-half of the compensation for taking lists, and for making proper entries in both the land list and the personal property list.

Therefore, in this case the assessor was entitled to be paid at the rate of thirty-five cents for lists showing taxable personal property that were actually taken from property owners or made out by him to include *other taxable personal property* not given in by the owner. Nevertheless, it is not possible to definitely determine from the agreed facts, which were the only facts before the trial court, whether or not this assessor faithfully performed all of the duties of his office. There is nothing to show that he failed to take or make lists covering all taxable personal property. What total amount he should have been paid if his compensation had been determined upon the basis, which we have held here it should be, does not appear, nor was it shown what total amount he was paid. The agreed facts show that there were 3455 property owners, from whom no lists were taken or for whom no lists were made; but they do not show that these persons owned any personal property in Butler County. If they owned only real estate, the assessor was not required to take a list from them, nor to make a list himself, but was only required to enter their tracts of land in the real estate part of the tax book, and was entitled to be paid for entering and assessing such tracts as stated in the sixth conclusion hereinabove set forth. There is no showing as to what were the total number of entries made in either part of the tax book, what the county court allowed for making the numerical assessment in the land list, or what, if anything, the assessor was paid on that basis. Without any showing as to these matters, there was no basis for a computation of the amount due the assessor for his 1932 work, and, therefore, it is apparent that the court was justified in refusing to find that the assessor was overpaid for that year.

■ On this record, that was the only issue, and the only question raised on this appeal is whether the court could find this issue for the defendant. This case is an action at law for the penalty of the bond and was heard by the court without a jury. The petition charged that defendant was "guilty of a breach of said bond" because he "did charge and receive from the State of Missouri *for which no services were rendered*" $633.85 in 1932; that this charge was for 3455 assessment lists which were not in fact made; and that defendant "did wrongfully . . . *convert and appropriate to his own use* the said sum . . . and *has failed to account for* . . . *or pay over* . . . said sum . . . although demand for payment has been made." The answer was a general denial. This made the issue whether or not defendant was overpaid by being paid for services he was required to render but did not render as assessor in 1932. Plaintiff had the burden of proof. Could plaintiff prove an overpayment for this year's work in any other way than to prove the whole amount which defendant was entitled to receive and then show that he received more than that amount? Of course, if it had been agreed that defendant was paid in full all amounts due him, except for taking assessment lists, then the question of whether or not he was overpaid could have been determined upon the facts before the trial court, but there was no such agreement and no such showing. While it appears that declarations of law were requested by both parties, there was nothing in the record to show any action of the court thereon—either giving or refusing them; nor is there any exception to any ruling or refusal to rule thereon by the trial court. Therefore, the only assignment of error, for our consideration, is that the court found for the wrong party. In this situation, if there is any reasonable theory upon which the judgment entered by the trial court would have been warranted, it should be affirmed, and "this is the rule even where the burden of proof is on the winning party." [St. Louis-San Francisco Railroad Co. v. Dillard, 328 Mo. 1154, 43 S. W. (2d) 1034, and cases cited.] Of course, if the successful party has the burden of proof there must be substantial evidence to support his judgment, but "a verdict for defendant need not be supported by affirmative, substantial evidence." [Bloch v. Kinder, 338 Mo. 1099, 93 S. W. (2d) 932.] As pointed out above, the facts before the trial court did not conclusively show that defendant was overpaid for 1932, and we cannot hold that the judgment was for the wrong party.

■ If this were all, this court might exercise its discretion to remand the case for retrial so that there could be an opportunity to make proof of the true state of the 1932 account with defendant for compensation. However, before that could be done, the question must be determined of whether or not a suit can be maintained on an assessor's bond to recover an overpayment of compensation,

occasioned merely by an honest mistake of law as to the basis therefor. A charge for work which one is required to do but has not done is a fraud in law. [Jackson County v. Fayman, 329 Mo. 423, 44 S. W. (2d) 849.] The petition herein is based on the theory that this assessor made a charge for services which he was required to render but did not render. If the facts showed that to be the situation, we have no doubt that recovery ought to be allowed on his bond, which undoubtedly would be breached either by a failure to perform required duties, or willful or intentional improper and wrongful conduct in the performance thereof. [See State ex rel. Dobbins v. Reed, 159 Mo. 77, 60 S. W. 70.] But here there is nothing to show that this assessor failed to render any services he was required to render. It is only shown that there were property owners from whom he neither took lists nor made lists for, but it is not shown that this had anything to do with the assessment of personal property. If these persons owned nothing in his county but real estate, the assessor was not required to take a list from them nor to make a list for such real estate, and he could in no way fail in the faithful performance of the duties of his office by not doing so. There is, therefore, no basis for a finding that this assessor failed to render any services he was required to render.

Section 9754, Revised Statutes 1929, requires an assessor to give bond "conditioned for the faithful performance of the duties of his office." Section 9752, Revised Statutes 1929, requires him to "take an oath that he will faithfully and impartially discharge the duties of his office, and that he will assess all the property in the county at what he believes to be its actual cash value." Section 9755, Revised Statutes 1929, provides the county court shall remove from office any assessor "who shall fail to perform any duty enjoined upon him by law, in the time prescribed," and "shall enter up judgment summarily upon the bond of such delinquent assessor, against him and his sureties, for such amount as shall be sufficient to complete the assessment of the county." It seems apparent that the primary purpose, of requiring assessors to give bond, is to require the payment of the cost of assessment in case of failure to promptly enter upon the performance of the duties of the office or to faithfully and diligently seek to correctly list and properly assess all taxable property in the county, and to protect citizens, the county, and the State from loss from failure to properly perform these duties. What is the obligation that his sureties assume? An assessor collects no money and cannot, either lawfully or unlawfully, withhold any money to pay his fees. Therefore, his bond is not to make good unlawful withholding of money or failure to account. A collector, for example, retains his own fees (Sec. 9935, R. S. 1929), his bond is conditioned to pay over as well as to faithfully perform all duties (Secs. 9885-9886, R. S. 1929), and several statutes specifically provide for re-

covery on his bond for failure to account and pay as required. [Secs. 9927-9929, and Secs. 9931-9934, R. S. 1929.]' When an assessor completes his work he does not decide the question of amount of compensation for himself, but must present a bill for his services, and it is the duty of the county court to investigate and audit his account before entering an order approving it for payment. [As to powers and duties of county court see Jackson County v. Faymen, 329 Mo. 423, 44 S. W. (2d) 849.] If both the assessor and' the county court, in good faith, compute this compensation upon the basis they honestly believe the law requires, then surely this is no breach of the bond, which casts liability upon the assessor's sureties.

It is pointed out in 46 Corpus Juris, 1070, section 402, that ''a bond conditioned on the faithful performance of the duties of the office'' has been held not to be breached by an officer claiming and receiving, from the public treasury, compensation in excess of that allowed him by law. [Furlong v. State, 58 Miss. 717; McCrory v. Woods County (Okla.), 150 Pac. 683; Hughes v. Oklahoma County (Okla.), 150 Pac. 1029; Shelton v. State (Okla.), 162 Pac. 224; Butte v. Bennetts (Mont.), 149 Pac. 92, Ann. Cas. 1918C, 1019.] Some of these cases even go so far as to cover claims based upon false statements. The theory of these cases is that such a bond is not security for an excessive claim for compensation by a public officer, *who is not the legal custodian of money* out of which he can pay himself and who is, therefore, bound to pay over and account in full therefor except as to the amount he is entitled to retain as his own compensation. They say this is true because other officers stand between an officer, who cannot thus pay himself, and the public treasury, to allow or reject his claim and to decide the matter between him and the county or State. These cases say that the money thus allowed such an officer is not received by him by virtue of his office (that is, it is not part of his official duties to receive it), but because he as an individual has made a claim for it as due him for his services as an officer. There are cases which take a different view. [See annotation following City of Butte v. Bennetts, Ann. Cas. 1918C, 1021; see, also, 22 R. C. L. 528, sec. 221; and note 99 A. L. R. 650, where comment is made on the question of good faith.] It is not necessary for us in this case to take the extreme position of either line of cases, because in none of the cases we have examined is there a situation such as is presented here, namely: An overpayment, if there was one, due to an honest mistake, by both the officer who made the claim and the county court that approved it, as to the meaning of a statute containing indefinite, inconsistent, and contradictory statements in stating the basis for computing the compensation, and in no way due to a false statement of fact. In this case there is no claim that this assessor failed to diligently seek to get all taxable property on his book, to list any known property thereon, or to fairly and reasonably value and

assess such property. The only question seems to have been as to the basis upon which he should be paid for fully and faithfully performing all of the duties of his office. The county and the State had an opportunity to properly compute the amount of compensation due him when his claim was presented, which was after all of his duties, in making the 1932 assessment, had been fully performed. He could not get any pay until they did pass upon and allow his claim. Should sureties be held to insure a correct interpretation of inconsistent and contradictory provisions in this law?

As we have shown, prior to 1909 assessors' pay, for making assessment of personal property, was one single fee, both for entering the owner's name in his book and listing his property opposite his name therein. He was paid nothing for taking the list of property from the owner. From 1909 to 1929, pay was computed on the basis of one fee *for taking* from the owner *the list of property* and another fee for entering his name and personal property in the tax book. Up to 1929, this compensation was stated to be *for making the personal assessment book*. After 1929, this section stated that it was "for making real estate and personal assessment books," and the thirty-five cent fee was allowed "per list" instead of "for taking lists." Since at one time assessors were paid for making the list of property in the assessment book and at another for taking the list of property from the owner, it was confusing, to say the least, to change the statute again to merely say "per list" without designating specifically what list was meant. We have stated what we consider to be the most reasonable construction of the present statute but we cannot fairly say that it was the only possible construction for which a reasonable argument could be made. As we have hereinabove shown, this statute has contained, since 1909, and still contains contradictory and inconsistent clauses which do not provide a clear and definite basis for computing the compensation of a county assessor. We could not reach a definite conclusion as to its meaning from the terms of the statute itself, but could only do so from a consideration of the history of the whole assessment system over three-quarters of a century. A fee statute could be and ought to be so clear that no one could misunderstand it. The township assessor's compensation statute is plain and this one could be made as clear as it is. Changes evidently were made without a full and clear understanding of what the assessment system was. Therefore, instead of making the amended section clearer, some of these changes have made this and other revenue statutes seem inconsistent within themselves and with provisions of other sections, and have left in doubt what was intended. Nevertheless, we do not mean to hold that an assessor or any other officer is entitled to keep more than he is allowed to collect by law for his services even if overpayment is due to an honest mistake of law; that question is not presented by this record because it cannot be determined therefrom

what this assessor was paid or was entitled to be paid. [See note Ann. Cas. 1915B, 811; State v. Young (Iowa), 110 N. W. 292, and cases cited.]

The judgment is affirmed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.